The court now calls case number 117-904, Henry the Parentage of Scarlett Z.-D, James R. D. Eppley v. Maria Z. Eppley, his appellant. Are you ready to proceed? May it please the court, counsel. My name is David Shull and I represent Maria Z., the respondent appellant. In this case, Jim asked Maria to marry him and Maria encouraged a relationship. However, after Jim chose not to marry Maria and chose not to adopt her daughter, Maria cut off that relationship and moved on. The issue in this case has always been Jim's standing. Whether a non-parent can bring common law claims of parentage, custody, and visitation in regard to a child, a minor child, who is already in the care, custody, and control of a fit parent. The lower courts have already considered and rejected Jim's common law claims regarding de facto parentage and equitable parenthood and psychological parenthood and in loco parentis. Now Jim is trying to claim the same relief but under another name, equitable adoption. So the question here is whether the theory of equitable adoption should be applied in the inheritance context in the case of the heart, which can or should also be applied in the context of family law. I would like to address why equitable adoption should not be applied to the area of family law and in so doing also address how the theory is incompatible with Illinois' comprehensive legislative scheme and the constitutional rights of fit parents. With regard to this court's decision in DeHart and the theory of equitable adoption, we agree with the first district's decision in Mancine which held that equitable adoption is a concept in probate to determine inheritance and should have no application in the context of proceedings for adoption, parentage, custody, or visitation. Because DeHart was about a will contest brought by an adult child who was seeking a rightful distribution from the estate of a deceased non-parent. And this court fashioned using equitable adoption and equitable remedy to prevent an injustice in that case that was caused by the held out the child as a biological child for his entire life, over 60 years, and also the non-parent mistakenly thought that he had legally adopted the child after the child found out the truth that he was not the biological son. He confronted the decedent and the non-parent admitted that but said that he had legally adopted the child when he was two years old and that they made it all legal by going through an attorney and even obtaining a birth certificate that the child used for most of his life. DeHart had nothing to do with parentage, custody, or visitation. DeHart had nothing to do with establishing a parent-child relationship. And DeHart had nothing to do with establishing a legal adoption. And it had nothing to do with a continuing, ongoing relationship between a minor child and an adult non-parent, especially where, in this case, the minor child has a living parent, and in this case we have a living non-parent who were never married. In this case, unlike DeHart, we do not have an invalid attempt to adopt. In this case, unlike DeHart, there lower courts found that Maria made no misrepresentations of fact to Jim and that, in fact, Jim was aware at all times that he was neither the biological nor adoptive father of Scarlett. So in this case, unlike DeHart, we have a fit legal parent who has the custody, care, and control of her daughter and has the constitutional rights to bring up that daughter the way she best deems fit. Now, in DeHart, this court considered what the right circumstances would be for the application of equitable adoption, and this court considered two types of cases, one being where the non-parent incorrectly held out the child as being legally adopted, even though the child was not, although the non-parent thought they were, and secondly, where the non-parent, as in DeHart, held out the child as his biological child through deceit or mistake. This court in DeHart found that equitable adoption wasn't a stop, and sometimes it's even called adoption by estoppel. However, the court found in DeHart that the non-parent estate was a stop from denying the heirship of the adult child due to the decedent's misrepresentations that were made over a lifetime. However, in the trial court, and the appellate court twice in this case, found that equitable estoppel does not apply to the facts of this case. Equitable estoppel requires some type of misrepresentation or a concealment of material fact, and the lower courts found that Jim did not identify a single fact that Maria misrepresented. Jim's response was that, well, it wasn't that Maria misrepresented my wife as her father. But a promise to do something in the future does not constitute a factual misrepresentation, just like Jim's promise to marry Maria did not constitute a material misrepresentation. For a promise founded upon affection or gratitude cannot be the basis of a legal action. And the courts below never found an agreement between Jim and Maria. Jim's relationship with Scarlett was always based upon, contingent upon his relationship with Maria, Scarlett's only parent. And Maria's encouragement of a relationship between Scarlett and Jim was consistent with someone who had received a After he asked Maria to marry him, Maria said that he could be Scarlett's dad, but that after he chose not to marry Maria and not to adopt Scarlett, that she didn't want him to be Scarlett's dad. That is no misrepresentation, that is no unjust effect, and that is no requirement for equity, because there's been no broader injustice, for it is not unjust for a mother to not want her daughter to hang out with her ex-fiancee who broke his promise to marry her. The appellate court should not say on the one hand that equitable estoppel does not apply to the facts of this case, and then find, on the other hand, that adoption by estoppel. What should apply is Illinois' comprehensive legislative scheme, which provides clear and bright-line rules as to who can become a parent, how one becomes a parent, and what a parent's rights are. And in addition, the comprehensive legislative scheme has built-in protections for both children and Mancine was correct when it found that the application of equitable adoption in the family law context would undermine the entire family law structure enacted by our legislature. It's unclear... Does the change in Illinois law to allow same-sex marriages have any impact on the policy arguments advanced in this case? I don't believe it does in this case. It may have an impact, I believe, in cases involving assisted reproduction, such as the MJ case or Jim's cited case of TPS and KMS, but not in this case, which involves a heterosexual couple. It's unclear how the appellate court found, when it was considering equitable parenthood, that the comprehensive legislative scheme supplants the common law of custody and visitation, but then on the other hand, when discussing equitable adoption, that Jim may not have to meet the statutory standing requirements. The comprehensive legislative scheme that protected Maria from equitable parenthood should also protect her from equitable adoption. But as the appellate court found, even if the common law was not supplanted by the comprehensive legislative scheme, common law never covered custody and visitation by non-parents where there's a fit parent who has the care, custody, and control of her child. If there was any common law rule, it was that fit parents are entitled to the care, custody, and control of their children, and that includes respect for the parent's determination of the best interests of her child. And that's what the superior rights doctrine is all about. Under the United States Supreme Court case of Troxel, fit parents enjoy a presumption that they act in the best interests of Illinois' comprehensive legislative scheme. To recognize Jim as having equitably adopted Scarlett would violate Maria's constitutional rights to raise her child according to her own best interest determination. And under Troxel, as long as Maria is fit, there should be no reason for state intervention into the private realm of her family life that would further question her ability to make decisions on behalf of Scarlett. And this court, in the Wickham v. Byrne case, said that parents don't have to be perfect. They have latitude. They can make wrong decisions. They can make decisions that others disagree with, even trial judges. But that does not require court intervention. The courts should not be put in a position where they second guess the parent's best interest determinations for their child, especially, as here, where the non-parent does not have the best interests of their child's parents or even step parents. Now we understand that the superior rights of parents is not absolute, as this court noted in your Wickham v. Byrne case. We acknowledge that there are limited instances, as Wickham noted, such as for health, safety, and welfare. However, this court gave examples of what that meant, such as required medical care at the birth of a child, required immunizations, required vision and hearing tests, or prohibition of child labor. But none of that applies here. So when the health, safety, and welfare is not at issue, then when there is a fit parent caring for the child, then that fit parent's best interest determinations should prevail, especially where the non-parent does not have statutory standing. Because to do otherwise would put the parent and the non-parent on equal footing. And that's exactly what Troxell and Wickham sought to avoid. So where a non-parent without statutory standing under the Marriage Act seeks a declaration of parentage custody and visitation, the court should not look at best interests where there's a custodial fit parent. Because, again, it just puts the trial judge in the position of second-guessing and supplementing or supplanting his best interest determinations for the fit custodial parent. So for non-parents, standing is critical. If Jim cannot establish standing, then he must show the unfitness. If Jim cannot establish standing, then he must show the unfitness of Maria. Any parental rights that would be granted to Jim outside of Maria's consent and against her approval would be a dilution of Maria's parental rights or a partial termination of her rights, even though she disagrees and even though there's been no unfitness found. And if such a decision was made, would be made, it would be subject to strict scrutiny. However, in this case, there's no compelling interest to grant equitable relief. And for those reasons, we're asking the court to reverse the appellate court's decision to apply equitable adoption. We're asking the court to affirm the trial court's denial of counts one and two and hold in favor of Maria. If there's any questions. It doesn't appear so. Thank you. Thank you, Your Honor. May it please the court, Camilla Taylor for petitioner appellee Jim R.D. The issue in this case is fundamentally about whether Illinois courts continue to have jurisdiction to hear claims for custody and visitation and child support brought by persons who lack statutory standing but who have functioned as a child's parent for many years with the consent and encouragement of the child's legal parent forming a close parent-child bond. The intermediate appellate court correctly found that Illinois courts do continue to have that doctrine of equitable adoption. Counsel for Maria challenges this, telling us that the Marriage Act and the Parentage Act are the sole sources of jurisdiction over custody, visitation, and support claims. But this is incorrect as a result of this court's settled precedent. And if the court were to take counsel's invitation to rule this way, it would impose a new limitation on Illinois court's authority to rule on these sorts of claims. So here's what that precedent says. In Parentage of MJ in 2003, this court held that the Parentage Act did not preclude common law claims for child support and that a non-parent may be responsible for child support under contract principles and the doctrine of promissory estoppel. In AWJ, this court held that the Marriage Act's standing provisions are not jurisdictional. And in Lehman v. Lehman, which is the court's most explicit pronouncement on this subject, this court permitted a case to move forward seeking custody based solely on the, quote, longstanding power of courts of equity to resolve child custody disputes rather than under the most closely applicable statutory scheme. Counsel, you don't get here without DeHart, do you? You're not in this when it came to establishing parentage outside of the statutory scheme. But the only case talking about equitable adoption, right? That's correct. Equitable adoption is one form of exercise. So let's talk about DeHart, a case that's near and dear to my heart. No pun intended. DeHart says the claimant must demonstrate the existence of some direct expression on the decedent's part of an intent to adopt the claimant, right? That's a quote from DeHart. That's correct. The intent may be shown by an unperformed agreement or promise to adopt. Why doesn't that statement in and of itself underscore counsel's argument why DeHart, at least, should never be applied to the straight-up context of someone trying to impose himself as a parent on a child, but instead should be strictly limited to the inheritance context? Under Jim's theory, it would seem that all it would take to impose a father-child relationship would be some statement from the father at some time that he wanted to adopt the child plus a few months or years of living with the child in a family setting, if we were to employ those words from DeHart to the facts of this case. Your Honor, I think DeHart says more than that. First of all, I think DeHart established a two-prong test for equitable adoption. The first was this intent to adopt prong, which Your Honor mentioned, which the court described as a term of art, which could be satisfied in at least three different ways. The statement of intent to adopt was one, Your Honor, but also an unconsummated attempt to adopt would be another means. Or third, representation to the child or community at large that the child is the decedent's natural or legally adopted child. But that's only the first prong. Right. But DeHart and Ford, in which DeHart relied, was strictly in the inheritance context. I mean, those cases were in the inheritance context. The doctrine really was employed to stop other errors of a decedent from denying a child his rightful inheritance and working a great injustice. If we were to adopt the appellate court's rationale, what you're arguing here today, wouldn't we be supplanting the legislature's careful consideration of how someone must go about becoming a parent in Illinois? Not at all, Your Honor. I mean, there's a lot of people who are saying that. DeHart did employ a second prong as well, which is the establishment of a parent-child bond. So not any person who says, I have an intention to adopt would be able to satisfy that equitable adoption test in DeHart. There would have to be a familial relationship established. And, of course, the evidence is overwhelming of that here. But in future cases, courts would have to make that threshold determination before performing a best interests analysis. Would we be supplanting a fit parent's right to refuse consent for adoption for a spouse or partner who wants to adopt a child? Not at all, Your Honor, because one of the things that Troxel and Wickham and all of the cases that we've given to the court in the briefing with respect to the way other states have resolved these sorts of claims brought by functional parents, the TPS case is another example, require some sort of threshold showing that the adult and the child was formed with the consent and encouragement of the legal parent. And so Wickham is not implicated. The MND case of this court is another example from 2004 where this court said that Wickham is not implicated at all when a court enforces a legal parent's agreement to allow a non-parent to enjoy visitation over that fit legal parent's later objection. Because that parent made an original determination that a bonded relationship between her child and those other adults was in her child's best interest. And so enforcing that agreement is actually giving effect to that parent's original determination about what was in her child's best interest. But a legal parent would be stripped away of any right not to go through with a formal statutory adoption by an end around the statutory procedure, right? Well, giving effect to the child-parent bond necessarily requires some sort of evaluation of whether there are evinces consent in the record for the development of that bond, whether there is a long-term parent-child relationship that was established through the participation of that legal parent. So that legal parent has an opportunity to participate in the process when she determines that she's going to bring another adult into the child's life and form a two-parent family that is co-parented. And that's how the Troxel prong is not implicated. But there's a second independent reason why there's no intrusion into parental autonomy here. Because under Wickham and Troxel, of course, courts have not only the authority but actually the obligation to protect the health, safety, and and the safety of the child. And so that's why we're here. And the reason why we're here is because we want to make sure that the child is not under threat of severe emotional harm. We've got the testimony of the expert psychologist who says that she is in danger of never being able to form a long-term attachment in adulthood if her relationship to the only father she's ever known is severed and that she's particularly vulnerable because of her experience in an adult facility. And we know from the visitation facilitator who observed more than 50 visits that she loves her father very much, she calls him dad, and she asked for those visits to go on longer. So we have a lot of evidence showing that there's a very strong bond here and that there would be harm to this child if that bond is severed. That's an independent and separate reason why there is no intrusion into Maria's fundamental right to parental autonomy. Is there any case that you can cite us apart from DeHart that would allow what you're asking here? Absolutely, Your Honor. I mean, there are a number of cases like Lehman, of course, and Parentage of MJ that make clear that statutes are not the exclusive source of jurisdiction for claims that seek to have custody or support with respect to a child. The GPS case, of course, on the intermediate appellate level is another example of a claim for a breach of oral agreement and promissory estoppel made by someone who is not a biological parent, but who had reared a child as her own that was born as a result of assisted reproductive technology. The intermediate appellate court distinguished the GPS case and Parentage of MJ, saying that those cases did not apply to this situation because the child here was brought into the family through a joint decision to adopt, made by two adults, whereas the children at issue in Parentage of MJ and in the GPS case were brought into their families through assisted reproductive technology. But that distinction should not make a difference to whether courts have jurisdiction in equity and can exercise their plenary authority in order to make sure that a child is able to continue a relationship with someone that she has always understood is her parent. This is a case where two adults, long before they ever got engaged to be married, according to the undisputed testimony below, started talking together about having a child together. So it is inaccurate to suggest that there was any sort of contingent agreement on Maria's part that this parent-child relationship would be formed, only contingent upon marriage. Instead, these two adults fell in love and they decided to discuss having a child together. And at some point, they discovered that Maria was not capable of having a biological child. When Maria was traveling in Slovakia, they discovered SZD, who was living in an orphanage, and then Jim paid for that adoption. The undisputed factual findings below are that he paid for it all. He participated in the process. He visited Slovakia while that process was pending. And even before that process was over, Jim and Maria's relationship was over. There are videos in the record that demonstrate that Maria was teaching this little girl to say, hi, daddy, I love you in English, teaching the little girl to call Jim daddy. This is indisputably a two-parent family from the very beginning. And while the record doesn't make clear why this family deteriorated and why the relationship between Jim and Maria fell apart, the fact remains that this little girl grew to love her father and to understand that she had a father and that she is at risk of severe emotional injury for the rest of her life if her relationship with her father is torn apart now. Could Jim have adopted her? He could have, Your Honor, but only with Maria's consent. And the testimony below is that he did bring it up and that he was concerned that Maria expressed the desire to work with a Slovakian attorney, and it never happened. The two were very focused on this girl's integration into life in the United States. She had some pretty severe academic difficulties at first, and she's still experiencing some challenges in that regard. She had some very strong difficulties sleeping. The testimony is that they were really focused on trying to help her get to the United States. And the domesticated adoption was something that they didn't do for a long while after SCD got to this country. If we adopt your argument, do we need to be concerned about undue litigation? Not at all, Your Honor, because circuit courts are well-equipped to figure out when there are these three necessary elements. When there are consent and encouragement of a legal parent to the formation of a parent-child relationship of significant duration. I mean, those are really the things that courts have looked at in the past. There have been a number of intermediate, of course, appellate decisions here in Illinois that have permitted claims for custody and visitation to go forward on principles of equity. But there are a great number of cases in other state Supreme Courts as well, including recent ones from 2013 and 2014. I think I gave you Kansas and Oklahoma. But some of the most, the leading cases with respect to equitable parent doctrines are the VC case from New Jersey. There's also HSHK from Wisconsin. Rubano is another case where a lot of these issues have been examined. But another way that this court can look at it, which could give this court some comfort that there won't be undue litigation, is to frame it as Justice McLaren did in his dissent and concurrence below, which is to look at it as application of equitable estoppel. And, of course, the equitable adoption doctrine is a form of estoppel. Equitable estoppel has been used by Illinois courts below. The Schlamm case from the Second Appellate District is one such example. The appellate court below believed that estoppel was not applicable here because it misconceived what the elements of the test for equitable estoppel is. So it erred as a matter of law with respect to what the legal doctrine of equitable estoppel requires. If your theory is accepted, what would be the result or how would it be affected if we were to impose custody of an unwilling opponent? Well, Your Honor, most of the custody disputes that come up here involve unwilling opponents of some sort. I mean, the MMD case, for example, from 2004, was a case in which there was a parent disputing with non-parents. And the parent had originally agreed to a visitation agreement, and the question was whether the court could enforce that in light of the trial. And what a court has to determine, once the court makes a threshold determination at the trial court level, that a legal parent agreed to create a parent-child relationship, and that that parent-child relationship does, in fact, exist, is then what's in the best interest of the child in terms of allocation of custody and visitation. So an action could proceed against an unwilling opponent? Absolutely. A legal parent may object to sharing custody or visitation with a functional parent, someone with whom she voluntarily decided to initiate a family with. And then a court would have to make a threshold determination to satisfy wiccum and troxel and the fundamental liberty interests that all parents have. And then a court would have to make a decision on whether or not that functional parent truly stands in the shoes of the parent. And if that is the case, then the court can move forward with a best interest allocation. With respect to equitable estoppel, the lower court's error was to suggest that there was a requirement for some sort of factual or fraudulent misrepresentation in order for an estoppel claim to move forward. That has never been the case in Illinois law. The Geddes v. Mill Country Club case is one example of when there was no fraud, no factual misrepresentation. I think Kenyon is actually an even better case that we highlighted a bit in a footnote in our reply brief, where a court estopped an attorney from seeking fees because he had made a promise that he would not seek fees in the future. And the court found that he could not even though there was no evidence of fraud, there was no evidence of bad faith on his part, the court found that he could not go back on his word with respect to his representations because that would harm another party and it would result in unfairness. So this case could be seen as exercise, I mean, one of the things that we think was an error below was to prevent the doctrine of equitable estoppel from being applied simply to prevent Maria from challenging the doctrine of equitable parent claim. And so the court would have the case in Jim's standing and then the case would move forward as other routine and familiar custody disputes do. With respect to the equitable parent claim, I also just want to refer the court quickly to the ALI principles that we cited in the reply brief. The ALI principles refer to equitable parent doctrine as parenthood by estoppel and the principles use those same three elements, consent by the legal party and then a bonded relationship and the adult's mutual intention from the start to create a two-parent family and their conduct in consistently holding out the child as their own. With respect to the child support, the oral agreement claim promissory estoppel and so on, none of these actually depend on Jim's status as a parent. The court should not have dismissed them. Jim indisputably could be liable for child support under parentage of MJ. He should not have to wait to be sued. He should not have to wait to be sued. He should be able to seek to support and seek an order establishing his support obligations in court. Agreements have been held enforceable in Illinois not only in the MMD case but parentage of MJ. DeHart notes that there's consideration for such agreements because it's understood that where there's an agreement to adopt a child where the legal parent has conferred the full benefits of fatherhood upon the person who agrees to function as the child's father and relinquished some of her control of the child, we think it obvious that mutual consideration exists. And out-of-state cases to look at for that oral agreement claim specifically are Ohio, the Mullen and the Bonfield case, Kansas, and the Eldridge case in New Mexico. Thank you. Just a few points. In this case, the lower courts never found any agreement to co-parent Scarlett. The only agreement in this case was Maria's agreement to marry Jim, which he chose not to marry her and he chose not to adopt Scarlett, even though he could have. At some point it broke down. The record shows that, as counsel said, Maria met Scarlett in Slovakia while visiting family. She then stayed in Slovakia for the entire year that the adoption proceedings were pending. She lived with Scarlett. Jim, during that year, he visited them five times, once at the beginning, once at the end, and three times in between. But it was during that year that a parental bond was established between Maria and Scarlett. In terms of DeHart, DeHart did not establish a parent-child relationship. DeHart gave an equitable remedy to an adult child to afford case, which did not find the application of equitable adoption in that case, even though the child in that case referred to the Fords as mom and dad for most of his life. A simple, close relationship is not sufficient. It also has to be an enduring relationship. And the record shows in this case that after that year-long adoption process, when Maria brought Scarlett back to the United States, they certainly had a honeymoon period. You know, they went on vacations, different places. But even according to Jim, by 2005, he was already questioning whether he should marry Maria. And by 2006, according to Jim, they were not having sexual relations much. And by 2007, not at all. So this narrative that Jim tries to portray in terms of this cohesive family unit for many years is simply not what the record shows. All of the talk about equity presumes that Jim has standing. The legal question before this court is standing. And I would remind this court of its decision in the Hewitt v. Hewitt case. Which talked about common law marriage and the property rights of people who cohabitate. But there, this court needs to step back and look beyond the rights of Jim and Maria and consider the impact that equitable adoption would have on our society and the institution of marriage. Recognizing equitable adoption in the family law context would encourage informal cohabitation agreements and informal adoptions without the statutory protections. And the courts will have to deal with that. All the while, it will weaken the institution of marriage and the foundation upon which our family-based society. So whether change is needed in this area of family law, it's the evaluations of sociological data and alternatives that is best suited for the legislature to address. They are the ones who have the superior investigative facilities, fact-finding facilities. It's the legislature's job to declare the public policy in the area of family law. And Springfield has not been stagnant. Our legislature knows the issues. They've been active. And we've been active. We've been active in the past. So just as common law marriages are invalid, so should be informal adoptions. And I'm not, you know, I'm not saying that there is no sympathy to be extended towards Jim. He obviously loves Scarlett and obviously had a relationship. However, once he chose not to marry Maria, and not to adopt Scarlett, Maria left and the people moved on. And incidentally, it's interesting to note that in the Troxell case, during the pendency of that appeal, the mother got married and her new husband adopted her daughters. So all of this talk about, you know, severe psychological harm, that's Jim's words. No psychologist mentioned those words. The guardian ad litem did not mention those words. What Scarlett has gone through is what every child of a divorce or broken relationship goes through, of course. But the issues in this case involve complex public policy considerations that are best left for the legislature. If there are no other questions? Thank you. Case number 117904, Henry, the parentage of Scarlett ZD, a minor, James R.D. Eppley v. Maria Z. Appellant, will be taken under advisement as agenda number eight. Mr. Shope and Ms. Taylor, thank you for your arguments today. Mr. Marshall, the court stands adjourned until 9 o'clock tomorrow morning.